Regis **FORCIER**, Joseph P. Labreche, Severino DiSandro and Wilfred Lapiere, Individually and on behalf of all other Debenture Holders of Columbus Mortgage and Loan Corporation of Rhode Island, Inc., Plaintiffs,

v.

Augusta **CARDELLO**, Richard J. Riccitelli and Alan S. Casale, Partners d/b/a Cardello, Riccitelli & Casale, CPAs, Defendants.

Civ. A. No. 91–0337L.

United States District Court, D. Rhode Island.

Nov. 7, 1994.

Edmond A. DiSandro, DiSandro–Smith & Associates, P.C., Inc., A. Lauriston Parks, III, Hanson, Curran, Parks & Whitman, Providence, RI, for plaintiffs.

John F. Dolan, Mark P. Dolan, Rice, Dolan & Kershaw, Joseph A. Kelly, Carroll, Kelly & Murphy, Providence, RI, for defendants.

### MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This matter is now before the Court on the motion of defendants Augusta Cardello, Richard J. Riccitelli, and Alan S. Casale, partners d/b/a Cardello, Riccitelli & Casale, CPA's ("Cardello"), for summary judgment as to four counts of plaintiffs' Amended Complaint. For the reasons stated below, Cardello's motion is granted as to Count II and denied as to Counts I, III, and IV.

### BACKGROUND

On February 15, 1991, Columbus Mortgage & Loan Corporation of Rhode Island, Inc., ("Columbus"), a mortgage lending firm, filed for protection from creditors pursuant

to Chapter 11 of the United States Bankruptcy Code. Columbus had been in business for over thirty years and had specialized in residential real estate loans secured by first and second mortgages. From August of 1961 until December of 1991, Columbus was owned and controlled by Joseph R. Muratore, Sr. ("Muratore").

At the time it declared its bankruptcy, Columbus' most significant group of creditors was its debenture holders[1]. These debenture holders provided a significant financial base for the operations of Columbus. For years, Columbus had used the money that it had acquired through selling the debentures to execute loans for first and second mortgages on real estate. At some point, however, Columbus' business practices changed. Columbus began making unsecured loans to Muratore and his associated real estate entities so that Muratore could purchase income-producing real estate. Muratore's self-dealing and breach of fiduciary duty is fully described in *Darr v. Muratore*, 8 F.3d 854 (1st Cir.1993). Columbus began issuing its debentures around 1970 and did so until 1990. In later years, some of the issues were used to retire maturing debentures. Finally, by 1991, approximately $4 million in debentures were outstanding in the hands of the public.

This action by debenture holders was filed on July 3, 1991. An Amended Complaint was filed on April 20, 1992. On April 27, 1993, this Court entered an Order certifying this as a class action suit, the class of plaintiffs consisting of all debenture holders of Columbus as of December 31, 1991. The plaintiffs named in the caption of this case were designated as class representatives.

Plaintiffs allege that at all relevant times Cardello provided accounting services to Columbus. Among the services provided by Cardello were the preparation of tax returns and unaudited financial statements from 1970 until 1975 and the preparation of audited certified financial statements from 1975 until 1990. Columbus used the certified financial statements to obtain approval from the Rhode Island Department of Business Regulation ("DBR") for the sale of debentures to the public. DBR received yearly financial statements describing the condition of Columbus, which it reviewed prior to permitting Columbus to sell debentures to the investing public. Between 1975 and 1979, DBR, partly in reliance upon the certified financial statements, permitted Columbus to issue debentures to the general public. While Cardello disclaims any knowledge that the debenture holders were receiving its financial statements or, indeed, that there even were any debenture holders, plaintiffs allege that Cardello either directly submitted the financial statements to DBR or submitted the statements to Columbus with the understanding that DBR would review the statements prior to permitting debenture sales by Columbus. The financial statements that Cardello provided to Columbus allegedly contained a series of misstatements and omissions of material fact. Most important, the statements failed to indicate that Columbus was experiencing severe financial difficulties. In particular, it is claimed that Columbus was de facto insolvent during the whole period 1983 to 1991.

Plaintiffs allege that at all relevant times the primary assets of Columbus were promissory notes secured by mortgages on real estate and that Cardello accepted, for the purposes of the financial statements, the real estate values provided by Muratore. As previously noted, Muratore owned and controlled Columbus, as well as its wholly-owned real estate subsidiary corporation, Columbus Development Corporation. Plaintiffs further allege that the values were inflated and that Cardello knew, or should have known, that the values were incorrect.

Plaintiffs also allege that for many years Columbus made unsecured loans to various affiliates of Columbus, including corporations and partnerships controlled by Muratore and his wife, Rose E. Muratore, and of which Muratore and/or his wife were often the sole shareholders, owners, officers or directors. For example, Muratore was a shareholder,

---

**1.** "Debentures are unsecured debt, as opposed to bonds, which are secured by the assets of the issuing company." *In re Worlds of Wonder Sec.* *Litigation,* 814 F.Supp. 850, 854 n. 2 (N.D.Cal. 1993). *See also SEC v. Howatt,* 525 F.2d 226, 229 (1st Cir.1975).

director, and officer of Muratore Agency, Inc. ("Muratore Agency") and Muratore Realty Corp. ("Muratore Realty"), and a general partner of Shawomet Holding Association ("Shawomet Holding"). Muratore's wife was a shareholder in Columbus, Muratore Agency, and Muratore Realty. She was also a director and secretary-treasurer of Columbus, an officer and director of Muratore Agency and Muratore Realty, and a partner in Shawomet Holding. These Muratore entities were all involved in the business of selling and developing real estate.

There is no dispute that Columbus provided several unsecured loans to the Muratore entities, drawing funds from the pool of money accumulated by the selling of debentures to citizens of Rhode Island. These loans were by no means insignificant. In fact, loans to the Muratore entities totaled $2,044,313 as of June 30, 1989, more than half of Columbus' total assets of $3,973,791 at that time.

While Columbus loaned money to these affiliates, in very few instances were there any promissory notes attending the affiliate loans. There was seldom any security for the loan, nor any written indication of the amount of interest to be paid on the loan. For example, although the loans were often used for the acquisition of real estate by the Muratore entities, rarely, if ever, were mortgages placed on the real estate. To the extent that security did exist for the loans, plaintiffs allege that the value of the security was insufficient collateral for the loans.

Despite the fact that Columbus received no money from any of the Muratore entities prior to 1991, Cardello stated in the financial statements for 1988 and 1989 that Columbus received interest income from its affiliates. Cardello failed to make clear that interest on the various loans was accrued but not paid and that a large percentage of the assets of Columbus were the unsecured receivables.

In addition, for many years prior to 1991, Columbus provided loans to its chief operating officer and principal shareholder, Muratore. As with the loans to the affiliated entities, these were essentially unsecured loans, not evidenced by promissory notes, security or evidence of interest rates. In preparing Columbus' financial statements, Cardello failed to identify the officer who received the loans or to indicate whether Columbus had ever received any repayments on the loans. This omission occurred despite the fact that Cardello performed the accounting work, including preparing tax returns and financial statements, for Columbus' affiliates.

Plaintiffs allege that the financial statements prepared by Cardello were an integral part of the prospectuses for the debentures provided by Columbus and that plaintiffs purchased their debentures in reasonable reliance upon the statements of Cardello. The prospectuses included a statement that "all of the financial statements included in this prospectus have been included in reliance upon the opinions and reports of Cardello, Riccitelli & Casale...." Columbus stated in the prospectuses that it would use the proceeds of the debenture sales to provide first and second mortgage financing, but, in fact, Columbus loaned considerable amounts of the money it received to Muratore and his entities, unsecured. Although Columbus was insolvent from 1983 until the time when it filed for bankruptcy protection, Cardello never made clear in any financial statement that the company was insolvent. Cardello never provided a "going concern" provision in the financial statements. Indeed, nothing in the statements suggested that the financial health of Columbus was suspect.

Nor did anything in the debentures suggest that the funds were being used for anything other than secure first and second mortgage financing. However, the reality was far different from the appearance presented by the financial statements. The debentures were used to fund what was in reality an elaborate pyramid scheme. The debentures were used to pay interest on the debenture notes extant at any particular time. Muratore also used the debenture money to fund the operations of his entities. In addition, Columbus' funds may have been used to pay miscellaneous personal debts of Muratore. The record contains no proof of repayment from Muratore to Columbus. This Court entered a judgment against Muratore and his entities in the amount of

$2,146,034.24 in favor of Stephen Darr, the Trustee of Columbus. That judgment was affirmed by the First Circuit. *See Darr v. Muratore, supra.* However, the debenture holders, as unsecured creditors, will only get a small percentage of that amount in the end since the Muratore assets are clearly insufficient to satisfy that judgment in full and there are more than $4 million in debentures outstanding.

In the late 1980's, the DBR realized that Columbus was not the healthy financial institution it had been led to believe and refused to permit another debenture offering. As a result, the pyramid scheme came crashing down. The debenture holders soon learned that the assets of Columbus were insufficient to cover the liabilities owed them, and this suit was filed.

## DISCUSSION

### I. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In determining whether summary judgment is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the nonmoving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991). Additionally, the moving party bears the burden of showing that no evidence supports the nonmoving party's position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Thus, in order for Cardello to prevail on its motion, it must show that no genuine issue of material fact exists to support plaintiffs' case. The motion can then be granted if, as a matter of law, Cardello is entitled to judgment in its favor.

### II. Plaintiffs' Complaint

Plaintiffs' Amended Complaint seeks punitive and compensatory damages on behalf of the debenture holders of Columbus, citing Cardello's accounting practices as the cause of their loss. Essentially, plaintiffs base their complaint on the contention that Cardello issued "clean" financial statements for Columbus, statements which both misstated and omitted material facts concerning Columbus' financial health. Cardello allegedly released these statements knowing that they would be used by Columbus (1) to obtain approval from DBR to issue debentures and (2) to solicit debenture sales among the general public, including members of the plaintiff class. Plaintiffs claim that Cardello knew or should have known that these "clean" audits were materially false and misleading and that the audits were not conducted in accordance with generally accepted accounting principles. Finally, plaintiffs claim that the debenture holders purchased their debentures in reasonable reliance on the financial statements contained in the debenture prospectuses.

Plaintiffs' Amended Complaint consists of six counts. Counts I through IV pertain to defendant Cardello. Counts V and VI against another defendant were voluntarily dismissed. Count I alleges negligence as a result of Cardello's audit of the financial status of Columbus. Count II is a claim for breach of contract. Count III states a cause of action for negligent misrepresentation as a result of Cardello's work. Counts IV alleges violations of Section 10(b) of the Securities Exchange Act of 1934, as amended ("1934 Act"), 15 U.S.C. § 78j(b) (1934), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("SEC"). Cardello's motion for summary judgment as to each of these four counts will now be discussed seriatim.

### III. Count I: Negligence

Count I of plaintiffs' Amended Complaint states a cause of action for negligence arising from the manner in which Cardello provided accounting services to Columbus. Plaintiffs allege that Cardello owed plaintiffs a duty of reasonable care in the preparation of Colum-

bus' financial statements, that plaintiffs were a foreseeable group who could be expected to rely on Cardello's accounting services, that Cardello misrepresented the financial condition of Columbus, and that as a direct and proximate result of Cardello's misrepresentation of the financial status of Columbus, plaintiffs purchased debentures and suffered losses. Cardello has moved for summary judgment on this count for two reasons: (1) Cardello owed no duty to plaintiffs as a matter of law, and (2) plaintiffs did not rely on the financial statements in purchasing the debentures as a matter of fact.

## A. The Existence of a Duty between Cardello and Plaintiffs

■ The threshold element of a cause of action for negligence[2] is the existence of a legal duty. Whether or not a legal duty exists is a question of law. Such a question is appropriately decided on a motion for summary judgment. In this case, the Court must decide whether Cardello, as an accountant, owes a duty of care to the debenture holders of Columbus even though they are not in contractual privity. By establishing such a duty, the Court will concomitantly define the sphere of liability in which the accountant practices, since all persons within the group to whom the accountant owes a duty of care will be prospective plaintiffs in the event of a breach.

In *Dowling v. Narragansett Capital Corp.*, 735 F.Supp. 1105 (D.R.I.1990), Judge Torres considered the question of an auditor's liabilities to third parties in negligence under Rhode Island law. As background, Judge Torres provided a clear summary of the different duties of care that other courts have used in considering precisely the same question. He eloquently stated that in the past,

... courts have reached different results in considering whether accountants can be held liable to parties with whom they are not in contractual privity under a theory of negligence. *Compare Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) (no liability) *with Rusch Factors Inc. v.*

*Levin*, 284 F.Supp. 85 (D.R.I.1968) (liability).... Those cases finding no liability generally involve situations in which the scope of potential liability cannot be calculated because it is impossible to accurately predict who might suffer foreseeable harm or what the magnitude of that harm might be. In such circumstances, courts have been understandably reluctant to impose on accountants an open-ended liability to third parties for the consequences of the accountant's carelessness in rendering normal services to a client. Such exposure has been described as 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.' *Ultramares*, 174 N.E. at 444. On the other hand, those cases in which liability is imposed generally deal with situations in which the plaintiff belongs to a limited class of persons (e.g., creditors or investors) whose reliance was actually foreseen. *See, e.g., Rusch Factors, supra.*

735 F.Supp. at 1125.

Factually, *Dowling* involved former shareholders of the Narragansett Capital Corporation ("NCC"), who brought suit to recover damages for the sale of NCC's assets for what they claimed was a grossly inadequate price. Among the defendants was NCC's investment bank. The former shareholders alleged that the investment bank had been negligent in delivering its "fairness opinion" of the value of the NCC's assets for the asset sale. The investment bank moved for summary judgment, contending that it owed plaintiffs no duty of care as a matter of law inasmuch as it was engaged by NCC.

The Court denied the investment bank's motion for summary judgment. In so doing, Judge Torres relied on the duty of care articulated by Judge Pettine in *Rusch Factors v. Levin*, 284 F.Supp. 85 (D.R.I.1968). In *Rusch Factors*, Judge Pettine had allowed an action to lie against an accountant for negligent preparation of financial statements. Citing the tentative draft of Section 552(1) of the *Restatement (Second) of Torts*, Judge Pettine wrote that an accountant should be

---

**2.** "Negligence is conduct which falls below the standard established by law for the protection of others." *Restatement (Second) of Torts*, § 282.

held liable for careless financial misrepresentations "relied upon by actually *foreseen* and *limited* classes of persons." *Rusch Factors,* 284 F.Supp. at 93 (emphasis added). Applying the *Rusch Factors* test to the *Dowling* case, Judge Torres concluded that the investment bank owed a duty of care to the former shareholders of NCC. He reasoned that the investment bank's "assessment was patently intended to guide shareholders in deciding whether to approve the sale" and that, consequently, the investment bank's "duty to exercise reasonable care in preparing its assessment extended to NCC's shareholders." 735 F.Supp. at 1125.

Courts attempting to articulate a duty of care running from accountants to third parties have often relied on the treatment of negligent misrepresentation in the *Restatement (Second) of Torts. See, e.g., Hochfelder v. Ernst & Ernst,* 503 F.2d 1100 (7th Cir. 1974) *rev'd on other grounds,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Koch Indus., Inc. v. Vosko,* 494 F.2d 713 (10th Cir.1974); *Dowling v. Narragansett Capital Corp., supra,* 735 F.Supp. 1105 (D.R.I.1990); *Ingram Indus., Inc. v. Nowicki,* 527 F.Supp. 683 (E.D.Ky.1981) (adopting *Restatement* view); *Rusch Factors v. Levin, supra,* 284 F.Supp. 85 (D.R.I.1968). Section 552 of the *Restatement (Second) of Torts* states:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or

knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

■ The *Restatement* is representative of the modern trend away from requiring strict contractual privity between professionals and those injured by information negligently supplied by professionals. The *Restatement* allows a restricted group of third parties to recover for pecuniary losses attributable to inaccurate financial statements. The restricted group includes third parties who the accountant intends to influence and those who the accountant knows their clients intend to influence.

■ Ideally, the *Restatement* standard intends to shield the accountant from liability to the investing public as a whole and yet, concomitantly, to oblige the accountant to deal carefully with persons over whom the accountant wields significant influence. The objective underlying the *Restatement* is to make the accountant cognizant of the extent of his or her influence and to encourage the accountant to exercise such influence carefully. In consequence, the *Restatement* approach extends the accountant's duty not only to those with whom the accountant is in contractual privity, but also to those persons who the accountant or client intend to receive the information for guidance. Such an extension of the duty is inherently reasonable.

■ Section 552 of the *Restatement* attempts to balance the accountant's professional functions and his potential liability by holding him accountable to a "person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it ..." *Restatement (Second) of Torts* § 552(2) (1977), and "whom [the accountant] knows is likely to rely on [the information] in a transaction that has sufficiently specific economic parameters to permit the supplier to assess the risk of moving forward." *Bily v. Arthur Young,* 3

Cal.4th 370, 11 Cal.Rptr.2d 51, 74, 834 P.2d 745, 769 (1992). In effect, an accountant who negligently misrepresents information is held liable to an actually foreseeable class of third persons. As Comment a to Section 552 explains, extending an accountant's liability to this foreseeable class "promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests." *Restatement (Second) of Torts* § 552 cmt. a (1977).

■ On the other hand, an accountant's potential liability must have reasonable boundaries. "It is not enough that the maker merely knows of the ever-present possibility of repetition [of information supplied by him] to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated." *Restatement (Second) of Torts* § 552 cmt. h (1977). Thus, while an accountant must perform work with a sufficient degree of care in order to protect himself from liability, the law must not arbitrarily extend that liability beyond his reasonable expectations as to whom the information will reach.

In sum, this Court is confident that the Rhode Island Supreme Court would hold that Cardello owed a duty of care to the limited group of persons for whose benefit and guidance Cardello intended to produce the reports and who could foreseeably rely on the reports. Nevertheless, Cardello argues that the Court should grant its motion for summary judgment because the plaintiff class does not fall within this limited group of foreseeable, intended recipients of the financial statements.

■ However, whether plaintiffs indeed fit into the class of persons to whom Cardello owed a duty of care is a question of fact, and such a question is inappropriately resolved at this stage of the proceedings. There remain genuine issues of material fact as to plaintiffs' status. For example, it is unclear whether Cardello intended that the unaudited and audited financial statements of Columbus benefit any class of persons other than Columbus. Also, it is unclear whether Cardello was aware of Columbus' intentions to use the report and, if so, to what extent. Finally, it is unclear whether plaintiffs' reli-

ance on the reports would be reasonably foreseeable. These questions need to be resolved at trial.

■ In order for plaintiffs to establish that Cardello owed a duty to plaintiffs at trial, plaintiffs must prove either (1) that plaintiffs are members of a class which Cardello intended the financial statements to benefit and that plaintiffs' reliance would be foreseeable; or (2) that plaintiffs are members of a class of persons which Columbus intended the financial statements to benefit, that Cardello knew of Columbus' intent at the time that it prepared the financial statements, and that plaintiffs' reliance would be foreseeable. *Dowling v. Narragansett Capital Corp., supra,* 735 F.Supp. 1105; *Rusch Factors, Inc. v. Levin, supra,* 284 F.Supp. 85, 91; *Venturtech II v. Deloitte Haskins & Sells,* 790 F.Supp. 576, 584 (E.D.N.C.1992). Until the factual determinations are made, the claim for negligence remains appropriately alive for resolution in this case.

**B. Reliance**

■ Cardello also urges the Court to grant summary judgment as to Count I because plaintiffs did not rely on the audited financial statements when they purchased their securities. Arguments concerning reliance play two roles in a cause of action for negligence. First, reliance helps to define the parties to whom the accountant owes a duty. As the *Restatement* suggests, the duty of care is defined not only by the intentions of the accountant to influence a particular group, but also by the foreseeability of the reliance of that group on the disseminated information. This first aspect of reliance was discussed in Part III. A., *supra,* where it was determined that the foreseeability of plaintiff's reliance is a question of fact that must be resolved at trial.

■ An entirely different aspect of reliance is its role in determining causation. To prevail in a negligence action, the plaintiff must not only show that the defendant owed plaintiff a duty of care and that duty was breached, but also that the defendant's negligence was the proximate cause of plaintiff's injury. *Russian v. Life–Cap Tire Services,*

*Inc.,* 608 A.2d 1145 (R.I.1992). If plaintiffs cannot prove that Cardello's accounting services were indeed the proximate cause of their loss, then plaintiffs cannot recover. *Kemplin v. H.W. Golden & Son,* 52 R.I. 89, 157 A. 872 (1931).

Causation is established in most cases by showing that but for the negligence of the defendant, harm to the plaintiff would not have occurred. *Evans v. Liguori,* 118 R.I. 389, 374 A.2d 774 (1977). To succeed in this case, therefore, plaintiffs must prove they purchased the debentures because of their reliance on the financial statements issued by Cardello. Cardello argues that summary judgment is nevertheless appropriate because plaintiffs have not shown that they relied on the financial statements in choosing whether to purchase the debentures.

It is clear that Cardello's arguments concerning reliance in this context ask for a premature determination of the facts. Whether or not plaintiffs did indeed rely on the financial statements is an issue for the fact finder to resolve, and Cardello has presented no compelling argument nor any view of the evidence that resolves all issues of material fact with respect to reliance. In its memorandum to this Court, Cardello asserts that there is no evidence that Cardello had any direct dealings with plaintiffs or that plaintiffs were a foreseeable group that would rely on the financial statements. However, while such arguments are appropriately directed to the issue of the existence of a duty of care, they do not shed any light on whether plaintiffs, in fact, did rely on Cardello's accounting work.

Plaintiffs, on the other hand, make two points to show reliance. First, plaintiffs allege that the audited financial reports were contained in the prospectuses which were issued to prospective debenture purchasers and that their decisions were made in reliance on those reports. Second, plaintiffs allege that they relied on Columbus' official registry with and approval from DBR, which used the audited financial statements in deciding whether to allow the issue of securities. These assertions create genuine issues of material fact as to whether plaintiffs relied on the financial statements.

Cardello's arguments are not without cogency, however. Quite correctly, Cardello has demonstrated that actual reliance is an issue that will be difficult to determine on a class-wide level. It has been pointed out that various debenture holders relied to different degrees on the statements made by Cardello, from significant reliance to none at all. When such questions of fact are particular to individual plaintiffs, the class action mechanism is an inefficient and even unfair method to resolve them, and this Court has the power to alter or amend its class certification order before a decision on the merits. *Lamphere v. Brown University,* 553 F.2d 714 (1st Cir.1977). Thus, at trial, each debenture holder will need to prove that he or she relied on the financial statements to recover individually. Whether this flaw in the class action design of the case has other repercussions remains to be seen.

Thus, for the above stated reasons, the Court concludes that summary judgment is inappropriate at this time, and Cardello's motion for summary judgment as to Count I is denied.

## IV. Count II: Breach of Contract

Count II of plaintiffs' Amended Complaint proceeds under a theory of breach of contract. Essentially, plaintiffs assert that they are entitled to recover as intended third party beneficiaries of a breached contract that existed between Cardello and Columbus. Plaintiffs argue that Cardello breached its contract with Columbus by performing audits from 1972 to 1990 in a manner that did not comply with generally accepted accounting principles. Cardello has moved for summary judgment on this Count, arguing that since plaintiffs were not intended third party beneficiaries of the contract, they have no cause of action for breach of contract.

The Rhode Island Supreme Court recognizes the general rule that only intended, and not incidental, third party beneficiaries can maintain an action for damages resulting from a breach of a contract between two other contracting parties. *See Davis v. New England Pest Control Co.,* 576

A.2d 1240, 1242 (R.I.1990); *Finch v. Rhode Island Grocers Association,* 93 R.I. 323, 329–30, 175 A.2d 177, 184 (1961). This rule holds true even where the duty imposed by the contract relates to matters which have a direct bearing upon the damages sustained. *Oliver v. Pettaconsett Con. Co.,* 36 R.I. 477, 484, 90 A. 764, 771 (1914). Incidental third parties beneficiaries of a contract do not have a right to recovery on the contract in the event of a breach.

The Rhode Island Supreme Court has looked for guidance in the past from the *Restatement (Second) of Contracts* to determine the rights and status of third party beneficiaries. *See, e.g., Finch v. Rhode Island Grocers Assn., supra,* 93 R.I. at 330, 175 A.2d 177. Section 302 of the *Restatement (Second) of Contracts* contains a test to determine the difference between intended and incidental third party beneficiaries. Section 302 reads:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the intended promise.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

The *Restatement* test essentially requires that the parties directly and unequivocally intend to benefit a third party in order for that third party to be considered an intended beneficiary.

The North Carolina Supreme Court has used the *Restatement* language to test whether a trade creditor was an incidental or intended third party beneficiary of a contract between a corporation and its accountant. *Raritan River Steel v. Cherry Bekaert & Holland,* 329 N.C. 646, 407 S.E.2d 178 (1991). In applying the test contained in Section 302 of the *Restatement,* the Court examined three aspects of the contracting parties' relationship: 1) the intent of the contracting parties, 2) the circumstances surrounding the contract-forming transaction, 3) and the actual language of the contract. 407 S.E.2d at 182. The Court found that the trade creditor was an incidental third party beneficiary to the contract between the corporation and its accountant because (1) the accountant lacked knowledge that the audited financial statements would be provided to a third party; (2) the contract failed to explicitly name the trade creditor as an intended third party beneficiary; and (3) the audited financial statements were not delivered directly to any third parties.

In Rhode Island, Superior Court Justice Krause also recently considered the question of whether depositors of a failed financial institution could be considered intended third party beneficiaries of a contract between the financial institution and its accountants. *Rhode Island Depositors Economic Protection Corporation, et al. v. Ernst & Young, et al.,* C.A. No. 92–1120 (R.I.Super.Ct., March 11, 1994) (hereinafter *DEPCO* ). In finding that the depositors were not intended beneficiaries of the contract between the financial institution and its accountants, Judge Krause made three important observations. Such observations are directly applicable to this case.

First, Justice Krause observed that "[u]nless the parties to a contract explicitly state otherwise, or absent circumstances which clearly indicate that performance under the contract is for the benefit of a third party, the law presumes that parties enter into a contract for their own benefit and not for the benefit of a third party."[3] *DEPCO,* at 3–4.

**3.** As support, Justice Krause cited *F.W. Hempel & Co., Inc. v. Metal World, Inc.,* 721 F.2d 610, 614 (7th Cir.1983) ("[T]here is always a strong presumption that contracting parties bargain and agree for themselves and only incidentally for third persons."); *Brown v. Summerlin Associates, Inc.,* 272 Ark. 298, 614 S.W.2d 227, 229 (1981)

("There is a presumption that parties contract only for the benefit of themselves, and a contract will not be considered as having been made for the use and benefit of a third person unless it clearly appears that such was the intention of the parties."); *U.S. v. United Services Auto. Ass'n,* 968 F.2d 1000, 1001–02 (10th Cir.1992). ("[T]he

Second, Justice Krause observed that a "promissor's mere awareness that someone other than the promisee may derive a benefit from the promissor's performance under the contract is insufficient to cloak that third party with the mantle of intended beneficiary."[4] *DEPCO*, at 4.

Third, Justice Krause observed that "strict construction and application of the foregoing principles are particularly evident in accountant-liability actions."[5] *DEPCO*, at 4.

In light of these principles, Cardello has asked this Court to grant summary judgment with respect to Count II, since plaintiffs cannot be considered third party beneficiaries of the contract between Cardello and Columbus both as a matter of fact and as a matter of law. In opposition, plaintiffs contend that it would be inappropriate to grant summary judgment at this stage based on inferences that can be drawn from the facts.

Primary among the inferences on which plaintiffs rely is the claim that Cardello may have been aware that some debenture holders reviewed and made use of its audits and reports before they purchased their debentures. Such a fact, plaintiffs claim, would be probative of Cardello's knowledge that plaintiffs relied on and were benefitted by the accounting contract between Cardello and Columbus. However, even if this were true, such a fact would have no legal consequence

here. Mere knowledge or awareness of an potential benefit cannot, without more, prove an explicit intent to confer a benefit, and plaintiffs must show a clear **intent** to benefit in order to state a claim as an intended beneficiary. Plaintiffs' argument here fails.

Nor does the fact that the Cardello reports may have been made available to the debenture holders evince or reflect the requisite clear intent to confer a benefit on those persons. Such actions by Cardello were plainly within the customary scope of an auditor's responsibilities to its clients. As pointed out in *Venturtech II v. Deloitte Haskins & Sells*, 790 F.Supp. 576, 583 (E.D.N.C. 1992), *aff'd without opinion sub nom.*, *Heritage Capital Corp. v. Deloitte Haskins & Sells*, 993 F.2d 228 (4th Cir.1993), reliance on such customary practices is misplaced in claiming third party beneficiary status.

The debenture holders have shown nothing more than that they received information from Cardello's audit. However, that the debenture holders received information generated by Cardello by no means suggests that they were intended to receive it, nor that the parties contemplated that they would receive it, explicitly or implicitly. In sum, the debenture holders were incidental beneficiaries of a relationship typical of an auditing firm and its clients. More than that

contract must be made for the third-party's benefit.... [T]he intent to benefit the third party must be clearly expressed in the contract."); *Blu-J. Inc. v. Kemper C.P.A. Group*, 916 F.2d 637, 640 (11th Cir.1990) (plaintiff must establish that "the intent and purpose of the contracting parties was to confer a direct and substantial benefit upon the third party.").

**4.** Justice Krause cited *Western National Bank of Casper v. Hawkeye–Security Ins. Co.*, 380 F.Supp. 508, 511 (D.Wyo.1974); *Numerica Savings Bank, F.S.B. v. Mountain Lodge Inn, Corp.*, 134 N.H. 505, 596 A.2d 131, 135–36 (1991); *Noller v. GMC Truck & Coach Division*, 244 Kan. 612, 772 P.2d 271 (1989).

**5.** Justice Krause cited *Raritan River Steel v. Cherry, Bekaert & Holland*, 329 N.C. 646, 407 S.E.2d 178, 182 (1991) ("[W]hen a third party seeks enforcement of a contract made between other parties, the contract must be construed strictly against the party seeking enforcement."); *Blu-J, Inc. v. Kemper C.P.A. Group*, 916 F.2d 637, 640

("In order for one to qualify as a third-party-beneficiary under a contract, it must be shown that the intent and purpose of the contracting parties was to confer a direct and substantial benefit upon the third party."); *Colonial Bank of Alabama v. Ridley & Schweigert*, 551 So.2d 390, 395–396 (Ala.1989) (summary judgment appropriately granted in favor of accountants where the alleged third party beneficiary failed to establish that the contracting parties intended, at the time the contract was created, to bestow a direct, as opposed to an incidental, benefit upon the plaintiff); *In re Sahlen & Associates, Inc. Securities Litigation*, 773 F.Supp. 342, 373 n. 3 (S.D.Fla.1991). ("[S]tockholders of a corporation are not third-party beneficiaries of a contract between the corporation and its auditors and thus, may not maintain a suit for breach of contract ... Accordingly, it follows that stockholders are not entitled to maintain a cause of action for the negligent performance of that contract."); *Pell v. Weinstein*, 759 F.Supp. 1107, 1119 (M.D.Pa.1991) (dismissing plaintiff's claims against auditors and denying plaintiff third party beneficiary status.).

must be shown in order to surmount Cardello's motion for summary judgment. *Venturtech II v. Deloitte Haskins & Sells, supra,* 790 F.Supp. at 583; *Pell v. Weinstein, supra,* 759 F.Supp. at 1119.

In order for plaintiffs to base a cause of action on their status as intended third party beneficiaries, they "must demonstrate, even at the summary judgment stage, some factual basis to satisfy the standard derived from basic principles of contract law which are strictly applied in numerous cases regarding accountant liability: an unequivocal intent to confer upon them a direct and substantial benefit." *DEPCO, supra,* at 9. Plaintiffs have simply not met this burden.

Therefore, Cardello's motion for summary judgment as to Count II is granted.

## V. Count III: Negligent Misrepresentation

Count III of plaintiffs' Amended Complaint proceeds under a theory of negligent misrepresentation. Plaintiffs allege that Cardello provided false information and failed to disclose material facts to the debenture buyers and DBR and that they reasonably relied on the information produced by Cardello in choosing to purchase their securities. Further, plaintiffs allege that as a direct and proximate result of Cardello's representations, plaintiffs have suffered significant financial damages. Cardello argues for summary judgment on this claim for three reasons: (1) Cardello owed no duty to plaintiffs; (2) plaintiffs did not rely on the financial statements provided by Cardello; and (3) plaintiffs cannot claim indirect reliance by relying on DBR.

Though a claim for negligent misrepresentation is similar to a claim for negligence, the causes of action are discrete. "Negligent misrepresentation is a separate and distinct tort, a species of the tort of deceit." *Bily v. Arthur Young, supra,* 11 Cal.Rptr.2d at 74, 834 P.2d at 768. Historically, courts and commentators have often conflated the two. *Id.*

The tort of negligent misrepresentation was recognized by the Rhode Island Supreme Court in *Estate of Braswell by Braswell v. People's Credit Union,* 602 A.2d 510 (R.I.1992). In that case, the Court held that the trial justice had correctly allowed an action for negligent misrepresentation to be maintained against a credit union whose agent had negligently told the plaintiffs that their loan was insured.[6] In reaching its conclusion, the Supreme Court adopted Section 552 of the *Restatement (Second) of Torts* as the appropriate standard for negligent misrepresentation claims. *Braswell,* 602 A.2d at 512.

Section 552 of the *Restatement* was quoted in Part III, *supra.* To paraphrase, the *Restatement* rule holds an auditor liable for negligent misrepresentations to a third party only if the auditor intends to supply the information for the benefit of one or more third parties in a specific transaction or type of transaction and the reliance of the third parties on the information is reasonably foreseeable. Liability should attach in cases where the auditor "manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs." *Id.,* com. (a). Also, the "gravamen of the cause of action for negligent misrepresentation is ... actual, justifiable reliance on the representations" of the defendant. *Bily v. Arthur Young, supra,* 11 Cal.Rptr.2d at 78, 834 P.2d at 772.

Rhode Island law is clear that contractual privity is not an element of the cause of action for negligent misrepresentation. *Dowling v. Narragansett Capital Corp., supra,* 735 F.Supp. 1105; *Rusch Factors, Inc. v. Levin, supra,* 284 F.Supp. 85. Any third party who is intended as a recipient of the information and who foreseeably relies on such information is entitled to recovery if he or she does indeed rely. *Id.*

---

6. Prior to this decision, the tort of negligent misrepresentation had been recognized by federal courts applying Rhode Island law. *See, e.g., Rusch Factors, Inc. v. Levin,* 284 F.Supp. 85, 91–92 (D.R.I.1968) (citing to the tentative draft of the *Restatement (Second) of Torts* § 552); *Gale v. Value Line, Inc.,* 640 F.Supp. 967, 971 (D.R.I. 1986); *Banco Totta e Acores v. Fleet Nat'l Bank,* 768 F.Supp. 943, 946–47 (D.R.I.1991).

Cardello's first argument—that summary judgment should be granted as to Count III because it did not owe plaintiffs a duty of care as a matter of law in the context of negligent misrepresentation—fails for the same reason that it failed earlier. *See* Part III. A., *supra.* At this point, there are various factual determinations which must be made before it can be determined whether or not plaintiffs fall into that class of persons to whom Cardello owed a duty of care. It is unclear whether Cardello produced the unaudited and audited financial statements with the intent to benefit any class of persons other than Columbus itself and whether such a class would be foreseeable. *See Dowling v. Narragansett Capital Corp., supra,* 735 F.Supp. at 1124 (holding that the question of whether the plaintiffs were "an actually foreseen and limited class of persons" who relied upon the financial statements and misrepresentations made by the defendants is a question of fact for the jury). There is also a question as to whether Cardello knew that Columbus would use the statements to misrepresent its financial condition to prospective debenture holders.

■ The same can be said of Cardello's second argument—that plaintiffs cannot prove reliance on the financial statements produced by Cardello. While, if proven at trial, such an argument would deny plaintiffs a recovery, Cardello has not met its burden in the context of a motion for summary judgment. See Part III. B., *supra.* Indeed, issues of material fact remain as to whether plaintiffs did rely on the financial statements produced by Cardello that must be resolved at trial.

■ Cardello's third argument—that plaintiffs cannot claim indirect reliance on DBR—merits independent consideration. In their Amended Complaint, plaintiffs have alleged (as a part of their negligent misrepresentation claim) that they relied on the financial statements produced by Cardello inasmuch as they relied on the work of DBR, which, as a matter of course, reviews the financial statements of issuers before they approve the issuance of securities. Their reliance on DBR, plaintiffs' claim, makes out a claim for "vicarious reliance," rooted in their trust of the thoroughness of DBR. Plaintiffs have made no allegation that DBR made any direct references or promises to them.

The question of vicarious or indirect reliance was addressed by the Court in *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989). In that case, the Court dismissed a count for negligent misrepresentation as to all plaintiffs who could not allege that they had directly relied on an audit report prepared by the defendant accountants. The Court stated that it was guided by the concern that "a cause of action for the investing public" would be created by a contrary holding. *Id.* at 1298–99. This concern was also articulated by the Court in *Eldred v. McGladrey, Hendrikson & Pullen,* 468 N.W.2d 218 (Iowa 1991) (holding that plaintiff's claim of vicarious reliance is too weak to support a finding of tortious misrepresentation).

■ The same considerations apply here. While Rhode Island has specifically rejected the holding of privity required by Chief Justice Cardozo in *Ultramares, Estate of Braswell by Braswell v. People's Credit Union, supra,* 602 A.2d 510 (R.I.1992), Rhode Island courts are still influenced in part by Cardozo's concern that there should not be "liability in an indeterminate amount for an indeterminate time to an indeterminate class." Thus, this Court refuses to accept plaintiffs' theory of vicarious reliance on DBR. To hold otherwise would expose accountants to broader liability than the *Restatement* suggests. Moreover, pure, indirect reliance has not been recognized in Rhode Island.

This case is distinguishable from *Bonhiver v. Graff,* 311 Minn. 111, 248 N.W.2d 291 (1976). In that case, the plaintiffs sued an accountant for negligent misrepresentation, claiming reliance on representations made to the state insurance commissioner. However, unlike this case, the state insurance commissioner had met with the plaintiffs and had given them assurances as to the financial security of the accountant's client. These assurances had been made in reliance upon the accountant's negligent misrepresentation. The Court held that since the core of the misrepresentations of the accountant had

been directly communicated to the plaintiffs, they were entitled to recovery. However, in the case at bar, no such representations were made by DBR. Plaintiffs' arguments about vicarious or indirect reliance on DBR are too weak to succeed.

However, there are still a number of factual issues that need to be resolved concerning plaintiffs' claims for negligent misrepresentation. Therefore, Cardello's motion for summary judgment as to Count III is denied.

## VI. Count IV: The 10b–5 Cause of Action

■ Count IV of Plaintiffs' Amended Complaint states a cause of action for violation of the federal securities laws. Plaintiffs allege that Cardello's audits of the financial status of Columbus contained material misstatements and omissions that caused the plaintiffs to suffer damages. Plaintiffs allege that the misstatements arise from Cardello's questionable application of generally accepted accounting principles.

■ Auditors can be held liable for misconduct under the federal securities laws. Under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the SEC, accountants may be held liable to the actual purchasers or sellers of securities for fraud or gross negligence. 15 U.S.C. § 78j(b). Section 10 of the 1934 Act reads in relevant part:

> It shall be unlawful for any person, directly, or indirectly by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of a national securities exchange ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 of the Rules and Regulations Under Securities Exchange Act of 1934, 17 C.F.R. § 240 (1934), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or

instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person, in connection with the purchase or sale of any security.

It is not necessary that the securities be sold through a public offering in order for a cause of action under Rule 10b–5 to be brought. *Bily v. Arthur Young, supra.*

■ Unlike causes of action for negligence and negligent misrepresentation, causes of action under Rule 10b–5 presume reliance; that is, the burden is not on a plaintiff to prove that he or she, in fact, did rely on the misstatements made by the defendant. Such a rule was developed because courts have recognized the unreasonable evidentiary burden that would be placed on an investor if such person was required to prove a "speculative state of facts, i.e., how he would have acted if omitted material information had been disclosed ... or if the misrepresentation had not been made." *Basic, Inc. v. Levinson,* 485 U.S. 224, 245, 108 S.Ct. 978, 990, 99 L.Ed.2d 194 (1988) (citations omitted). Of course, that presumption may be rebutted by evidence that the alleged misinformation had no effect on the action taken. *Id.* at 248, 108 S.Ct. at 992.

■ In this case, Cardello has urged the Court to grant summary judgment because it claims that plaintiffs could not have relied on the financial statements produced by Cardello. But where, as here, the financial statements were included in the prospectus that accompanied the issuance of debentures, the burden is on Cardello to prove that plaintiffs did not rely on the information contained in the financial statements. And, as stated *supra* Parts III.B. and V., Cardello's arguments about reliance can not succeed at this stage, since they are fact-bound.

There remain genuine issues of material fact with respect to Count IV of plaintiffs' Amended Complaint. Not only must it be resolved by the trier of fact whether plaintiffs did rely on the information contained in the financial statements, but also it must be decided whether Cardello acted with sufficient mental culpability to be held responsible under Rule 10b–5. As a result, it is premature to dispose of this Count at this time.

Accordingly, Cardello's motion for summary judgment as to Count IV is denied.

### Conclusion

For the reasons stated above, Cardello's motion for summary judgment is granted with respect to Count II and denied with respect to Counts I, III, and IV. No judgment will enter until all claims are resolved.

It is so ordered.